

FILED
2017 Dec-18  PM 03:29
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## NORTHWESTERN DIVISION

| | | |
|---|---|---|
| **RUFUS HARRIS, JR.; ROSETTA HARRIS,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **CV NO: 3:16-CV-1917-MHH** |
| | ) | |
| **JP MORGAN CHASE BANK, N.A.,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

---

## DEFENDANT JPMORGAN CHASE BANK, N.A.'S MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

---

JOHN DAVID COLLINS
JOSHUA R. HESS

MAYNARD, COOPER & GALE, P.C.
1901 SIXTH AVENUE NORTH
SUITE 2400, REGIONS/HARBERT PLAZA
BIRMINGHAM, ALABAMA 35203-2618
(205) 254-1000
(205) 254-1999

*Attorneys for Defendant JPMorgan Chase Bank, N.A.*

# <u>TABLE OF CONTENTS</u>

I.  INTRODUCTION.................................................................................1

II.  STATEMENT OF UNDISPUTED FACTS ...................................2

  A.  Plaintiffs' Loan.............................................................................2

  B.  Plaintiffs Default On Their Loan By Failing To Make Mortgage Payments. ..................................................................................4

  C.  Plaintiffs Fail To Make Timely Payments Under A Trial Modification Plan.........................................................................5

  D.  Plaintiffs Fail To Submit All Necessary Information For A Loan Modification And Make Misrepresentations On Their Application For Loan Modification.......................................................................6

  E.  Chase Timely and Fully Responds to Plaintiffs' Counsel's QWRs .............8

  F.  Chase Notifies Plaintiffs of Its Intent to Accelerate and Foreclose............11

  G.  Plaintiffs File This Lawsuit.......................................................11

III.  LEGAL STANDARD ...........................................................12

IV.  ARGUMENT ....................................................................13

  A.  Plaintiffs' Defamation and False Light Claims Based On Alleged Inaccurate Credit Reporting Are Preempted By The Fair Credit Reporting Act ("FCRA"). ............................................................13

  B.  Plaintiffs' Breach of Contract Claim Fails As A Matter Of Law...............14

    1.  Plaintiffs' Non-Performance And Inability To Demonstrate Any Breach By Chase Precludes Their Contract Claim. ...........................................14

    2.  Plaintiffs' Breach of Contract Claim Based On The 2013 Trial Modification Fails Because Plaintiffs Did Not Perform Under The 2013 Trial Modification.............................................................18

    3.  Plaintiffs Have No Damages...............................................22

  C.  Plaintiffs' False Light Claim Based On Publication Of Foreclosure Notices Fails As A Matter Of Law.......................................................22

  D.  Plaintiffs' Defamation Claim Fails Because The Foreclosure Notices Were Accurate And Plaintiffs Have Not Suffered Any Special Damages...........24

  E.  Plaintiffs' RESPA Claim Fails As A Matter Of Law. ...............................27

1. Chase Timely Responded To The QWRs It Received. ..........................27

2. Chase Did Not Receive Certain QWRs From Plaintiffs........................30

3. Plaintiffs Suffered No Damages Related To Any Purported RESPA Violations. ................................................................................................31

F. Plaintiffs' FCRA Claim Fails Because They Never Submitted A Dispute To Any Credit Reporting Agency Or Chase.................................................34

G. Plaintiffs' FCDPA Claim (Count Twelve) Fails Because Chase Is Not A "Debt Collector" Under The FDCPA. ........................................................35

1. Plaintiffs Were Not In Default When Chase Acquired Their Mortgage Loan. ......................................................................................................36

2. Chase Is Not A Debt Collector Because It Owns The Debt At Issue....37

V. CONCLUSION ............................................................................................38

## I.   <u>INTRODUCTION</u>

Plaintiffs undisputedly defaulted on their mortgage loan by failing to make their April 1, 2010 mortgage payment and <u>every monthly payment thereafter</u>. After their default, Chase offered a trial modification plan to Plaintiffs, but they failed to submit timely payments under the plan, and it was therefore terminated. Plaintiffs also submitted multiple Requests for Mortgage Assistance to Chase, none of which contained the information required to evaluate their eligibility. And, on top of their failure to submit necessary information, Plaintiffs failed to disclose in *every* Request for Mortgage Assistance that <u>they purchased a second home secured by a mortgage in favor of another bank.</u> Plaintiffs are <u>current</u> on this other home loan, despite being roughly $160,000 in arrears after failing to make a mortgage payment to Chase in almost eight years.

As a result of Plaintiffs' default and failure to cure, Chase accelerated the maturity of their loan and complied with all contractual and statutory notice requirements necessary to foreclose on the property. In an effort to thwart foreclosure, Plaintiffs filed this action asserting sixteen claims against Chase—nine of which were previously dismissed by the Court for failure to state a claim upon which relief may be granted. (*See* D.E. 27).[1] Plaintiffs' remaining claims for Breach

---

[1] In the Court's June 14, 2017 order dismissing nine of Plaintiffs' claims, the Court ordered Plaintiffs to respond to Chase's arguments that Plaintiffs' false light and defamation claims are preempted and barred by FCRA. Plaintiffs responded and Chase filed a Reply Brief in Support of

of Contract (Count Six), False Light (Count Eight), Defamation/Libel/Slander (the "Defamation" claim) (Count Nine), violations of RESPA (Count Eleven), violations of FCRA (Count Twelve), violations of the FDCPA (Count Thirteen), and for declaratory relief (Count Sixteen) all fail as a matter of law. Accordingly, as discussed in further detail below, summary judgment is due to be entered in favor Chase.

## II.   STATEMENT OF UNDISPUTED FACTS

### A.   Plaintiffs' Loan

1.   On or about August 12, 2005, Rufus J. Harris, Jr. ("Mr. Harris") executed a Note in the original principal amount of $148,750.00 (the "Note") to Long Beach Mortgage Company ("Long Beach"). (D.E. 52-1, Affidavit of A. Hernandez, at ¶ 3 and Ex. 1 thereto; D.E. 52-2, Deposition of Rufus Harris[2], pp. 28:7-28:22 and Ex. 2 thereto)).

2.   The Note was secured by a mortgage (the "Mortgage") executed in favor of Long Beach, conveying the property commonly known as 185 Sunny Acres, Muscle Shoals, Alabama 35661 (the "Property"). The Mortgage was

---

its Motion to Dismiss on August 1, 2017. (D.E. 39). The Motion to Dismiss preemption arguments are still pending.

[2] Plaintiff Rosetta Harris ("Mrs. Harris") testified that she would defer to her husband's testimony regarding anything related to the mortgage and servicing of the mortgage, and she had no independent knowledge beyond Mr. Harris's testimony. (D.E. 52-3, Deposition of Rosetta Harris, pp. 11:15-13:9). Accordingly, because Mrs. Harris testified that she agreed with, and deferred to, Mr. Harris's testimony regarding all matters discussed herein, Chase will only refer to Mr. Harris's deposition testimony when discussing Plaintiffs' claims in this lawsuit.

recorded in the Probate records of Colbert County, Alabama in Mortgage Book 200529, Page 623. (D.E. 52-1, ¶ 4 and Ex. 2 thereto; D.E. 52-2 at p. 34:12-35:17 and Ex. 3 thereto). The Note and Mortgage are referred to collectively as the "Loan."

3.      Washington Mutual Bank ("WaMu") was the successor by merger of Long Beach. On September 25, 2008, WaMu was closed by the Office of Thrift Supervision, and the Federal Deposit Insurance Corporation ("FDIC") was named Receiver. That same day, Chase entered into a Purchase and Assumption Agreement ("P&A Agreement") with the FDIC pursuant to which Chase acquired certain WaMu assets from the FDIC as Receiver ("FDIC-R") for the failed bank, including the Harrises' mortgage loan. (D.E. 52-1, ¶ 5 and Ex. 3 thereto).

4.      At the time Chase acquired Plaintiffs' Loan, Plaintiffs were current on their monthly payments and the Loan was not in default. (D.E. 52-1, ¶ 6 and Ex. 4 thereto; Ex. 4 to D.E. 52-2).

5.      On or about January 24, 2011, Plaintiffs transferred their interest in the Property to Jerrica Harris via Quitclaim Deed. (D.E. 52-4, Quitclaim Deed, Chase/Harris 003714-3715). The Quitclaim Deed was recovered in the Probate records of Colbert County, Alabama in Mortgage Book 2011, Page 1763. (*Id.*).

6.      Chase is the current holder and servicer of Plaintiffs' Loan. Chase has in its possession the original collateral file for the Loan, including the original Note

3

endorsed to blank. (D.E. 52-1, ¶ 7).

7.     An Assignment of Mortgage was executed on January 10, 2013 which restated Chase's status as holder and owner of the Mortgage. (*Id.* at ¶ 7 and Ex. 5 thereto).

### B.     Plaintiffs Default On Their Loan By Failing To Make Mortgage Payments.

8.     Plaintiffs defaulted on their Loan by failing to make their April 1, 2010 payment and all succeeding payments thereafter. (*Id.* at ¶ 8 and Ex. 4 thereto; D.E. 52-2, pp. 43:10-44:21).

9.     Plaintiffs understood that, if they defaulted on their payment obligations and failed to cure the default, Chase could accelerate the maturity of the Loan and foreclose on the Property. (D.E. 52-2, at pp. 31:21-32:22).

10.     Chase sent Mr. Harris a Notice of Intent to Foreclose by letter dated September 30, 2010 in accordance with the terms of the Mortgage, notifying Mr. Harris of his default, the amount required to cure the default, and that if the default was not cured by October 20, 2010, then Chase may accelerate the maturity of the Loan. (D.E. 52-1, ¶ 9 and Ex. 6 thereto; D.E. 52-2, 46:2-47:20; and Ex. 5 thereto).

11.     As of September 30, 2010, Plaintiffs' Loan was $9,271.63 past due. (Ex. 6 to D.E. 52-1; D.E. 52-2, 47:13-20 and Ex. 5 thereto).

12.     On or about November 24, 2010, Chase (through its counsel) sent a Notice of Acceleration of Promissory Note and Mortgage in accordance with the

terms of the Mortgage, notifying Mr. Harris that Chase had elected to accelerate to maturity the entire remaining unpaid balance of the debt ($175,742.75) and was preparing to commence foreclosure proceedings. (D.E. 52-1, ¶ 10 and Ex. 7 thereto; D.E. 52-2, 49:1-51:17).

### C.   Plaintiffs Fail To Make Timely Payments Under A Trial Modification Plan.

13.   On or about May 30, 2013, Chase sent a trial modification agreement (the "2013 Trial Modification") to Mr. Harris. (Ex. 12 to D.E. 52-2). Mr. Harris executed the 2013 Trial Modification on June 17, 2013. (D.E. 52-1, ¶ 11 and Ex. 8 thereto; Ex. 13 to D.E. 52-2).

14.   The 2013 Trial Modification required that Plaintiffs make three trial payments in the amount of $1,233.09 on July 1, 2013, August 1, 2013 and September 1, 2013, respectively. (*See id.*; Ex. 12 to D.E. 52-2).

15.   The 2013 Trial Modification expressly provided that, should Plaintiffs fail to make each required payment in a timely manner, their Loan would not be modified. (Ex. 8 to D.E. 52-1, at Section 2(E); Ex. 13 to D.E. 52-2).

16.   Plaintiffs did not make a single timely payment. On July 16, 2013, fifteen days *after* the deadline for July payment, Chase received a Western Union wire payment in the amount of $1,233.09. (D.E. 52-1, ¶ 12 and Ex. 4 thereto; D.E. 52-2, pp. 67:14-71:7 and Ex. 4 thereto; D.E. 52-5, Western Union 000001-12, Produced by Western Union in Response to Subpoena).

17.     Chase did not receive a payment in the month of August 2013. (*Id.*).

18.     On or about September 12, 2013, eleven days *after* the deadline for the September payment, Chase received another Western Union wire payment in the amount of $2,466.18. (*Id.*).

19.     Because Plaintiffs did not comply with all requirements under the 2013 Trial Modification (i.e. make all timely payments), it was terminated, and Plaintiffs were notified of the termination by letter dated September 17, 2013. (D.E. 52-1, ¶ 12 and Ex. 9 thereto; Ex. 14 to D.E. 52-2)

**D.      Plaintiffs Fail To Submit All Necessary Information For A Loan Modification And Make Misrepresentations On Their Application For Loan Modification.**

20.     In addition to offering the 2013 Trial Modification, Chase evaluated Plaintiffs for a potential loan modification under the Home Affordable Modification Program ("HAMP") as well any other available modification programs. (D.E. 52-1, ¶ 13).

21.     Plaintiffs submitted four Requests for Mortgage Assistance ("RMAs") to Chase which were dated or faxed on or about October 1, 2013, May 30, 2014, June 25, 2014, and March 18, 2015. (*See* D.E. 52-1, ¶ 13 and Exs. 10-13 thereto; Exs. 15, 19, 20, 22 to D.E. 52-2).

22.     Chase conducted a review after receiving each RMA to determine whether Plaintiffs were eligible for a loan modification, but Plaintiffs did not

provide documentation necessary to complete the review, including but not limited to, documentation regarding pension benefits Mr. Harris was receiving and a fully executed 4506T-EZ form.[3] Chase called Plaintiffs on multiple occasions in connection with each RMA to request the necessary documents, but Plaintiffs never submitted the requested documentation. (D.E. 52-1, ¶¶ 14-17 and Ex. 14 thereto).

23.    By letters dated December 27, 2013, April 2, 2015, June 20, 2015, in connection with each RMA, Chase informed the Harrises that it was unable to approve them for mortgage assistance since they did not submit the necessary paperwork. (*Id.* and Exs. 15-17 thereto).

24.    Each of Plaintiffs' RMAs also contained unequivocal misrepresentations in that they failed to disclose that they owned a second home secured by a mortgage given to another bank.

25.    On or about July 21, 2011—prior to submitting an RMA to Chase—Plaintiffs executed a Note, Disclosure, and Security Agreement in the original principal amount of $193,500 (the "First Metro Note") to First Metro Bank – Muscle Shoals ("First Metro"). (D.E. 52-6, First Metro Bank 000036-000039, Produced by First Metro Bank in Response to Subpoena). Under the First Metro Note, Plaintiffs gave First Metro a security interest in the Property described as

---

[3] A properly executed Form 4506T-EZ authorizes the IRS to provide Chase with a copy of Plaintiffs' Individual Tax Returns for purposes of verifying their income.

116 Kimberly Avenue, Muscle Shoals, Alabama 35661 (the "Kimberly Property"). (*See id.*). The First Metro Note was also secured by a mortgage which was executed on or about July 21, 2011. The First Metro Mortgage was recorded in the Probate records of Colbert County, Alabama in Mortgage Book 2011, Page 15403. (D.E. 52-7, First Metro Mortgage).

26.    In each RMA, Plaintiffs were specifically asked whether they had any additional liens/mortgages or judgments. Plaintiffs were also required to disclose their household expenses on each RMA, including any "Monthly Mortgage Payments on Other Properties" and household income, including rental income. Plaintiffs were also asked to disclose any other properties they owned, including the mortgage servicer, the mortgage balance, and the monthly mortgage payment on such properties. Finally, in each RMA, Plaintiffs were advised that they were submitting the information in the RMA under penalty of perjury, and any misstatement of material fact made in completion of the documents would subject them to potential criminal investigation and prosecution for certain crimes.

27.    Despite these warnings and their clear obligation to disclose such information, Plaintiffs did not disclose the existence of the First Metro Loan. (D.E. 52-1, ¶ 18 and Exs. 10-13 thereto).

**E.    Chase Timely and Fully Responds to Plaintiffs' Counsel's QWRs**

28.    After Plaintiffs failed to submit information in connection with their

8

March 2015 RMA, on or about June 8, 2015, Attorney Kenneth James Lay sent a letter to Chase described as a Qualified Written Request ("QWR") for information regarding Plaintiffs' Loan. (D.E. 52-1, ¶ 19 and Ex. 18 thereto; Ex. 24 to D.E. 52-2).

29.    At the time Chase received the QWR, it did not have authorization from Plaintiffs to provide Attorney Lay (or anyone else) with confidential information concerning Plaintiffs' Loan. (D.E. 52-1, ¶ 20).

30.    On or about June 15, 2015, Chase wrote to Mr. Harris to acknowledge receipt of Attorney Lay's letter. (*Id.* at ¶ 20 and Ex. 19 thereto; D.E. 52-2, pp. 129:20-131:12 and Ex. 25 thereto).

31.    On June 17, 2015, Chase sent a follow up letter advising that it required authorization from Mr. Harris in order to provide confidential account related information to Attorney Lay. Chase's June 17, 2015 letter enclosed an Authorization to Furnish and Release Information ("Authorization") and advised the Mr. Harris to "resubmit [his] request for information about this account" after the Authorization was signed, returned and processed. (D.E. 52-1, ¶ 20 and Ex. 20 thereto; D.E. 52-2, pp. 178:20-179:13 and Ex. 26 thereto).

32.    Chase (through its foreclosure counsel) followed up with Attorney Lay on November 16, 2015, November 30, 2015, December 22, 2015, January 5, 2016, and January 20, 2016, requesting a signed authorization. (D.E. 52-8, Harris

9

88-93).

33.     Chase responded to the QWR received on June 11, 2015, by letter dated February 8, 2016. In the response to Plaintiffs' "QWR", Chase notified Plaintiffs that the Loan was valid and legally enforceable, identified Chase as the loan servicer, and provided a breakdown of all amounts due and owing on the Loan. (D.E. 52-1, ¶ 21 and Ex. 21 thereto; Exs. 27 and 33 to D.E. 52-2). Chase also enclosed copies of the Loan Transaction History (from the inception of the loan to the present), the Note, the Mortgage, and a Payoff Quote. (*Id.*).

34.     Chase did not receive another letter from Plaintiffs or Attorney Lay until October 24, 2016, when by letter dated October 21, 2016, Attorney Lay sent another QWR to Chase. (D.E. 52-1, ¶ 22 and Ex. 22 thereto).

35.     On or about October 31, 2016, within five business days of receipt of the October 24, 2016 QWR, Chase acknowledged receipt of the October 24, 2016 QWR. (D.E. 52-1, ¶ 23 and Ex. 23 thereto).

36.     Chase responded to the October 24, 2016 QWR by letter dated November 2, 2016 notifying Plaintiffs that the Loan was valid and legally enforceable, identified Chase as the loan servicer, and provided a breakdown of all amounts due and owing on the Loan. (D.E. 52-1, ¶ 24 and Ex. 24 thereto). Chase also enclosed copies of the Loan Transaction History (from the inception of the loan to the present), the Note, the Mortgage, and a Payoff Quote. (*Id.*).

10

**F.** **Chase Notifies Plaintiffs of Its Intent to Accelerate and Foreclose.**

37.    By letter dated August 11, 2016, Chase sent Plaintiffs (c/o their legal counsel) a second Acceleration Warning letter ("August 11, 2016 Notice of Intent to Foreclose") in accordance with the terms of the Mortgage, notifying Plaintiffs of their default, the amount required to cure the default, and that if the default was not cured with 35 days from the date of the Notice of Intent to Accelerate, then Chase may accelerate the maturity of the loan. (D.E. 52-1, ¶ 25 and Ex. 25 thereto).

38.    Chase's August 11, 2016 Notice of Intent to Foreclose indicated that Plaintiffs were **$132,292.22** past due on their monthly mortgage payments. (Ex. 25 to D.E. 52-1).

**G.** **Plaintiffs File This Lawsuit.**

39.    Plaintiffs admit that their Loan is in default and that they have not made a mortgage payment in over seven years. (D.E. 52-2, pp. 43:10-44:21; 178:1-179:4).

40.    Plaintiffs also admit that they did not make timely payments under the 2013 Trial Modification. (*Id.* at pp. 71:4-72:2).

41.    Nevertheless, on October 2, 2016, Plaintiffs filed this action against Chase because Chase attempted to exercise of its right under the Note and Mortgage to foreclose on the Property. (D.E. 1-1, at p. 5-25).

42.    Chase voluntarily suspended foreclosure proceedings in light of

Plaintiffs' lawsuit. (D.E. 52-1, ¶ 26).

43.     Plaintiffs continue to remain in the home without making mortgage payments. (Rufus Harris Depo,. pp. 178:1-179:4).[4]

## III.   **LEGAL STANDARD**

Summary judgment is appropriate if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" if it "might affect the outcome of the suit under the governing [substantive] law." *Anderson,* 477 U.S. at 248; *Tipton v. Bergrohr GmbH-Siegen,* 965 F.2d 994, 998 (11th Cir.1992). The court must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in the nonmoving party's favor. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986). However, a party may not defeat summary judgment by providing a general denial unaccompanied by any evidentiary support. Fed. R. Civ. P. 56(e)(2); *see, e.g., Courson v. McMillian,* 939 F.2d 1479 (11th Cir. 1991); *Hutton v. Strickland,* 919 F.2d 1531 (11th Cir. 1991). To avoid summary judgment, the nonmoving party must provide more than a scintilla of evidence; the nonmovant

---

[4] Given that Plaintiffs have continued to live in the home despite not making payments for nearly eight years, Chase requested that Plaintiffs pay their monthly mortgage payments into escrow each month, but Plaintiffs refused. Chase then filed a Motion to Require Plaintiffs to Deposit Mortgage Payments, Taxes, and Insurance Payments Into Court, which is currently pending before this Court. (D.E. 49).

must "come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co.,* 475 U.S. at 587.

## IV.  <u>ARGUMENT</u>

### A.  **Plaintiffs' Defamation and False Light Claims Based On Alleged Inaccurate Credit Reporting Are Preempted By The Fair Credit Reporting Act ("FCRA").**

Chase filed a Motion to Dismiss Plaintiffs' false light and defamation claims insofar as those claims are based upon alleged inaccurate credit reporting, and that motion is currently pending before the Court. (*See* D.E. 23; D.E. 39). Chase adopts and incorporates its Motion to Dismiss and Reply Brief as if fully set forth herein.

As detailed in Chase's Motion to Dismiss, Plaintiffs' defamation claim is expressly based on the allegation that Chase "communicated to credit reporting agencies and/or other third parties, false information that Harrises defaulted on the loan." (D.E. 20, at ¶ 69). This claim clearly concerns "subject matter regulated under § 1682s-2" and, as such, it is preempted and barred by the FCRA. *Gregory v. Select Portfolio Servicing, Inc., et al.*, No. 2:15-cv-781-JHE, 2016 WL 4540891, at *8 (N.D. Ala. Aug. 31, 2016). Moreover, Mr. Harris has now testified that Plaintiffs' false light claim is based, at least in part, on Chase's credit reporting.

> Q.   Okay. And then in paragraph 63 it says, defendants held Harrises up in a false light and made undesirable and negative credit reputation reports about the Harrises in the national credit reporting media and to his homeowners insurance carrier. Do you know what that's referring to?

A.      Yeah, it's on my credit. It ruined my credit.

Q.      Okay.

A.      It messed my credit up, the credit bureau.

(D.E. 52-2, pp. 156:16-159:4). Because Plaintiffs' false light claim, *by their own admission*, arises out of Chase's reporting of inaccurate information to credit reporting agencies, it is likewise preempted and barred by FCRA.

**B.      Plaintiffs' Breach of Contract Claim Fails As A Matter Of Law.**

Plaintiffs allege in a broad and conclusory fashion that Chase breached the parties' contract by assessing certain fees, failing to apply certain payments, failing to provide a "proper" notice of default and notice of acceleration, and failing to abide by the 2013 Trial Modification. (D.E. 20, at ¶¶ 47-54). As demonstrated below, Plaintiffs' breach of contract claim fails because (1) Plaintiffs admittedly breached their obligations under the terms of the Loan; (2) Plaintiffs cannot demonstrate Chase's non-performance under the terms of the Loan; (3) Plaintiffs failed to make timely payments pursuant to the 2013 Trial Modification; and (4) Plaintiffs have suffered no damages.

1.      Plaintiffs' Non-Performance And Inability To Demonstrate Any Breach By Chase Precludes Their Contract Claim.

a. *Plaintiffs Failed To Perform Under The Note and Mortgage.*

The elements of a breach-of-contract claim under Alabama law are (1) a valid contract binding the parties; (2) the plaintiffs' performance under the

contract; (3) the defendant's non-performance; and (4) resulting damages. *Reynolds Metals Co. v. Hill*, 825 So. 2d 100, 105 (Ala. 2002). Although Plaintiffs allege repeatedly in the Amended Complaint that they "were not in default" on their Loan when Chase initiated foreclosure proceedings (*see e.g.*, D.E. 20, at ¶¶ 10, 13, 18, 21, 22), Mr. Harris testified to <u>exactly the opposite</u> in his deposition; namely, that he has not made a mortgage payment since <u>2010</u>. (D.E. 52-2, pp. 178:5-179:4). This, of course, is entirely consistent with the payment history report for Plaintiffs' Loan. (*Id*. at Ex. 4; Ex. 4 to D.E. 52-1).

Clearly, based on Mr. Harris's own sworn admissions, Plaintiffs cannot demonstrate <u>their performance</u> under the contract – a required element of their breach of contract claim. *See Gray v. Reynolds*, 553 So. 2d 79, 82 (Ala. 1989) ("Courts should not enforce an agreement where the party seeking enforcement has failed to perform his part of the agreement . . . ."); *Mann v. Bank of Tallassee*, 694 So. 2d 1375, 1380 (Ala. Civ. App. 1996) (where plaintiffs defaulted on their loan, they could not establish the bank failed to perform its obligations under the contract merely by taking possession of the collateral post-default). Plaintiffs' undisputed failure to perform, standing alone, requires the entry of summary judgment in favor of Chase on their breach of contract claim.

   b.  *Chase Performed Its Obligations Under The Contract.*

Plaintiffs' breach of contract claim is based on unspecified "fees" and

"charges," failure to apply to certain payments, and failure to provide a "proper" notice of default and notice of acceleration. (D.E. 20, at ¶¶ 47-54). These allegations are demonstrably false and wholly lacking in evidentiary support, but not entirely surprising given that Plaintiffs' breach of contract claim erroneously and repeatedly references *Bank of America*, a non-party who has no role in this litigation. (*See id.* at ¶ 51).

(1)   *No Evidence of "Returned" Monthly Payments.*

Plaintiffs claim that Chase returned their January 2015 mortgage payment "without reason" and that certain unspecified payments were "never applied" to their account (D.E. 20, at ¶ 50). For starters, Plaintiffs' allegation that they made a "January 2015 mortgage payment" is truly baffling given that Mr. Harris testified the last <u>regular monthly payment he tendered to Chase was in March of 2010</u>. (D.E. 52-2, pp. 44:19-21) (Q. "And after that [March 2010 payment], there's not another payment; is that correct?" A. "Yeah."). Moreover, Mr. Harris <u>admitted</u> in his deposition that he had no evidence of any payment to Chase in January 2015. (*Id.* at pp. 151:6-152:5). This again, is consistent with the payment history which does not reflect receipt of any January 2015 payment, or any other errant payments which were improperly applied. Similarly, Plaintiffs' allegation that certain mysterious, unidentified payments were improperly applied is perplexing given that Mr. Harris testified he was current on his loan until May 2008, received a loan

16

modification, remained current on his payments until March 2010, and since March 2010 has failed to make another payment. (D.E. 52-2, pp. 41:20-44:21). Put simply, Plaintiffs' allegations are in direct conflict with Mr. Harris's own testimony and completely detached from the actual facts and uncontroverted evidence in this case.

       (2)   *Chase Provided Plaintiffs With a Proper Notice of Default and Notice of Acceleration.*

Plaintiffs allege that, "[e]ven if the Harrises are in default," Chase "failed to send proper notice of default, a proper notice of intent to accelerate, and a proper notice of acceleration." (D.E. 20, ¶ 52). These allegations are likewise baseless and directly refuted by the correspondence sent to Plaintiffs. And importantly, such allegations are irrelevant given that Chase <u>has not foreclosed</u> and Plaintiffs remain in the Property.

The contractual notice provision contained in Plaintiffs' Mortgage required Chase to (1) specify the default; (2) specify the action required to cure the default, (3) specify a date, not less than 30 days from the date notice is given by which the default must be cured; (4) advise that the failure to cure the default on or before the date specified in the notice may result in acceleration of the debt and sale of the property; and (5) inform of the right to reinstate after acceleration and to bring a court action to assert the non-existence of default. (Ex. 2 to D.E. 52-1, ¶ 21).

As discussed above, on September 30, 2010, Chase sent Mr. Harris a Notice

of Intent to Foreclose in accordance with the terms of the Mortgage, notifying Mr. Harris of his default, his right to bring a court action to assert the non-existence of default, the amount required to cure the default, and that if the default was not cured by October 20, 2010, then Chase may accelerate the maturity of the Loan. (D.E. 52-1, ¶ 9 and Ex. 6 thereto; D.E. 52-2 pp. 45:20-47:21 and Ex. 5 thereto). <u>Plaintiffs failed to cure the default</u>. Therefore, on November 24, 2010, Chase (through its foreclosure counsel) wrote to Mr. Harris in accordance with the terms of the Mortgage, notifying Mr. Harris that Chase had elected to accelerate to maturity the entire remaining unpaid balance of the debt and was preparing to commence foreclosure proceedings. (D.E. 52-1, ¶ 10 and Ex. 7 thereto; D.E. 52-2, pp. 49:11-51:20 and Ex. 7 thereto).

Plaintiffs <u>admit</u> that they were in default, and the aforementioned letters were properly addressed and mailed to them.[5] Those letters, which speak for themselves, were "proper" and fully discharged Chase's notice obligations pursuant to Paragraph 21 of the Mortgage. (Ex. 2 to D.E. 52-1, ¶ 21). Accordingly, Chase has undeniably performed under the parties' agreement.

2.   <u>Plaintiffs' Breach of Contract Claim Based On The 2013 Trial Modification Fails Because Plaintiffs Did Not Perform Under The 2013 Trial Modification.</u>

---

[5] Although it was not required to do so (because Plaintiffs never cured), Chase sent Plaintiffs a second Acceleration Warning Letter dated August 11, 2016 notifying them of the default, the amount to cure, the deadline for curing, and the possibility of acceleration absent reinstatement. (Hernandez Aff., ¶ 25 and Ex. 25 thereto).

Plaintiffs allege that Chase "failed to abide by the terms" of a trial modification "which would be made permanent upon him making his three trial payments with the last in September 2014." (D.E. 20, at ¶ 53). Mr. Harris testified in his deposition that this allegation referred to the 2013 Trial Modification. (D.E. 52-2, pp. 142:4-143:4). As discussed below, Plaintiffs' allegations are once again directly contradicted by the undisputed facts because they breached the express terms of the 2013 Trial Modification by failing to make timely payments.

On or about May 30, 2013, Chase offered Plaintiffs the 2013 Trial Modification, which Mr. Harris executed on June 17, 2013. (D.E. 52-1, ¶ 11 and Ex. 8 thereto; Ex. 12 to D.E. 52-2). Under the 2013 Trial Modification, Plaintiffs were required to make three trial payments, on July 1, 2013, August 1, 2013, and September 2013 respectively, each in the amount of $1,233.09. (*See id.*; Ex. 13 to D.E. 52-2).

The Trial Modification expressly stated that, in pertinent part:

**If (i) I do not make the three Trial Period payments required under the Section 2 Plan in a timely manner; . . . the Loan Documents will not be modified and this Agreement will terminate**. In this event, the Lender shall have the rights and remedies provided by the Loan Documents and any payment I make hereunder shall, at the Lender's option, be applied to amounts I owe under the Loan Documents or refunded to me; and

I understand that the Plan described in Section 2 is not a modification of the Loan Documents and that the Loan Documents will not be modified unless and until (i) I meet all of the conditions required for

modification under Section 3 and (ii) the Modification Effective Date has occurred. **I further understand and agree that the Lender will not be obligated or bound to make any modification of the Loan Documents if I fail to meet any one of the requirements under this Agreement.**

(Ex. 8 to D.E. 52-1; Ex. 13 to D.E. 52-2) (emphasis added); *Bonhoff v. Wells Fargo Bank, N.A.*, 853 F. Supp. 2d 849, 855 (D. Minn. 2012) (recognizing that a "TPP is an offer to *consider* modification, *expressly conditioned* on continued trial payments (for three months or longer) and other criteria.") (emphasis added).

Plaintiffs did not make a single timely payment. On July 16, 2013, fifteen days *after* the deadline for the July payment, Chase received a Western Union wire payment in the amount of $1,233.09. (D.E. 52-1, ¶ 12; D.E. 52-2, pp. 67:14-71:7; D.E. 52-5, at 000005-12). Chase did not receive a payment in the month of August 2013. (*Id.*) Finally, on or about September 12, 2013, eleven days *after* the deadline for the September payment, Chase received another Western Union wire payment in the amount of $2,466.18. (*Id.*). Because Plaintiffs did not comply with all requirements under the 2013 Trial Modification, it was terminated, and Plaintiffs were notified of the termination by letter dated September 17, 2013. (D.E. 52-1, ¶ 12 and Ex. 9 thereto; Ex. 14 to D.E. 52-2). Plaintiffs' failure to perform forecloses their breach of contract claim as a matter of law.

Furthermore, even if Plaintiffs had submitted timely trial payments, they would nevertheless be ineligible for a permanent modification because they made

material misrepresentations in their 2013 Trial Modification. The 2013 Trial Modification provides that, if Plaintiffs successfully follow the workout plan **and** their "representations in Section 1 continue to be true in all material respects," their Loan would be modified. (Ex. 8 to D.E. 52-1, at Section 3; Ex. 13 to D.E. 52-2) In the 2013 Trial Modification, Plaintiffs represented that "[t]here [had] been no change in the ownership of the Property since [they] signed the Loan Documents." (*Id.* at Section 1).

Here, the "representations in Section 1" of the 2013 Trial Modification were clearly not "true in all material respects" when Plaintiffs executed that document because, only two years earlier, they transferred ownership of the Property to their daughter via a Quitclaim Deed. (D.E. 52-4). Stated differently, Plaintiffs were seeking to modify a loan on Property they no longer owned. This misrepresentation, standing alone, disqualified Plaintiffs from obtaining the very modification forming the basis of their breach of contract claim.[6] (Ex. 8 to D.E. 52-1; Ex. 13 to D.E. 52-2). Moreover, the transfer of ownership is also an event of default under the Mortgage which (separate and apart from their failure to make payments) gives Chase the right to accelerate the maturity of the Loan. (Ex. 2 to D.E. 52-1, at ¶ 17)

---

[6] Plaintiffs' misrepresentations in the 2013 Trial Modification are not isolated incidents either—indeed, in the four RMAs they submitted to Chase, Plaintiffs repeatedly failed to disclose that they were obligated on the First Metro Loan on the Kimberly Property.

Accordingly, Plaintiffs' breach of contract claim is also barred because they lied to Chase before, during, and after the loan modification process.

### 3. Plaintiffs Have No Damages.

In light of the undisputed evidence regarding Plaintiffs' payment default, the fact that their payment arrears alone exceed $160,000, and the fact that no foreclosure sale has been conducted, Plaintiffs cannot possibly recover on a claim for breach of contract because they cannot show any damages resulting from Chase's alleged breach. In the absence of any damages, Plaintiffs' contract claim fails as a matter of law. *See Hardesty v. CPRM Corp.*, 391 F. Supp. 2d 1067, 1074 (M.D. Ala. 2005) (granting summary judgment on breach of contract claim against plaintiff who had "sustained no recoverable damages."). For this additional reason, summary judgment should be entered in favor of Chase.

### C. Plaintiffs' False Light Claim Based On Publication Of Foreclosure Notices Fails As A Matter Of Law.

Under Alabama law, "[o]ne who gives publicity to a matter concerning another that places the other before the public in a false light is subject to liability to the other for invasion of his privacy, if (a) the false light in which the other was placed would be highly offensive to a reasonable person, and (b) the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed." *Regions Bank v. Plott*, 897 So. 2d 239, 244 (Ala. 2004) (citation omitted). "[F]alsity is the *sine qua*

22

*non* of a false-light claim." *Id.* In this regard, truth is not an affirmative defense to a false light claim; rather, "falsity is an element of the plaintiff's claim" and therefore, "false light plaintiffs bear a heavier burden because they must make an affirmative showing of falsity rather than leaving it to defendants to justify the offensive statement." *Id.* (citation omitted).

While Plaintiffs' allegations are sparse and vague, aside from Chase's alleged inaccurate credit reporting (*see* Section (IV)(A), *supra*)[7], Mr. Harris testified that his false light claim was based on Chase's publication of foreclosure notices related to his default and Chase's acceleration of the Loan. (D.E. 52-2, pp. 153:9-16; 156:5-15). In this regard, Plaintiffs allege that Chase "knew Harrises was [*sic*] not in default on the account" and as such there was no basis to publish the foreclosure notice. (D.E. 20, at ¶ 62). Contrary to these allegations, however, Mr. Harris testified that <u>Plaintiffs had not made a payment on the Loan since March 2010 and were in default</u>. (D.E. 52-2, pp. 43:10-44:21; 178:1-179:4). Accordingly, any foreclosure notice stating that Plaintiffs had defaulted on the Loan clearly was not false, which standing alone bars Plaintiffs' false light claim. *See Plott*, 897 So.

---

[7] As discussed above, to the extent Plaintiffs' false light claim is based on improper credit reporting, it is barred and preempted by FCRA. However, even if the false light claim based on credit reporting was not preempted, it still fails because reporting credit information to a credit reporting agency does not constitute "publicity." *See McCleary v. DLJ Mortg. Capital, Inc.*, No. 15-00098-WS-C, 2017 WL 454054, at *9 (S.D. Ala. Oct. 11, 2017) ("[R]eporting false information to credit reporting agencies does not constitute "publicity" under Alabama law.")

2d at 244.[8]

Moreover, aside from failing to demonstrate how any foreclosure notice published by Chase could conceivably be false, Plaintiffs have not presented any evidence that Chase "had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed." *Id.*; *see also Schifano v. Green County Greyhound Park, Inc.*, 624 So. 2d 178, 180 (Ala. 1993). Indeed, it is hard to fathom how Chase could have had knowledge of or acted recklessly as to the falsity of a statement **which was not false**. Accordingly, Chase is entitled to summary judgment on Plaintiffs' false light claim.

### D.      Plaintiffs' Defamation Claim Fails Because The Foreclosure Notices Were Accurate And Plaintiffs Have Not Suffered Any Special Damages.

Similar to their false light claim, Plaintiffs allege that Chase is liable for defamation because Chase "published in the newspaper false information regarding his [*sic*] account being in default and false information regarding its right to conduct a foreclosure sale on the Harrises' property" because "the Harrises account

---

[8] While Plaintiffs do not point to any specific foreclosure notice which placed them in a "false light", Plaintiffs have produced two foreclosure sale notices, for foreclosures which were set to take place on April 29, 2015 and November 2, 2016. (D.E. 52-8, Harris 9-10; 280-281). Both foreclosure notices <u>correctly</u> state that Plaintiffs were in default under their Loan and the Property would be sold at bid auction. There is simply nothing false in either foreclosure notice which could possible give rise to a false light claim, particularly in light of Plaintiffs' own admission that they failed to make their required mortgage payments. (D.E. 52-2, pp. 43:10-44:21; 178:1-179:4).

[was] current" and Plaintiffs were "not delinquent as reported." (D.E. 20, at ¶¶ 67, 71). In order to state a claim for defamation, a plaintiff must allege the following:

> 1) a false/defamatory statement concerning the plaintiff; 2) an unprivileged communication of that statement to a third party; 3) fault amounting at least to negligence on the part of defendant; and 4) either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication of the statement.

*Temploy, Inc. v. Nat'l Council on Compensation Ins.*, 650 F. Supp. 2d 1145, 1155 (S.D. Ala. 2009) (citations omitted).[9] "Special damages are the material harms that are the intended result or natural consequence of the slanderous statement, and the general rule is that they are limited to 'material loss capable of being measured in money.'" *Casey v. McConnell*, 975 So. 2d 384, 390 (Ala. Civ. App. 2007).

Plaintiffs' defamation claim, like their other claims, is based on unsupported assertions that are completely belied by the evidence of record. For starters, Plaintiffs' defamation claim is entirely based on Chase's representations in certain foreclosure notices that Plaintiffs were in default. Clearly, this claim fails because Mr. Harris <u>admits</u> that Plaintiffs *were* in default under the Loan after they failed to make necessary mortgage payments. (D.E. 52-2, pp. 43:10-44:21; 178:1-179:4). This alone is fatal to their defamation claim.

Moreover, Plaintiffs do not identify, and have not provided any evidence to

---

[9] "There are two types of defamation: libel, which involves the use of print media to publish defamatory comment, and slander, which involves the oral expression of a defamatory comment." *Blevins v. W.F. Barnes Corp.*, 768 So. 2d 386, 390 (Ala. Civ. App. 1999). Plaintiffs have not identified a single "oral expression of a defamatory comment" and that alone precludes any slander claim.

support, any resulting special damages. Unless a claim is categorized as slander *per se*, a plaintiff seeking to recover for defamation must show "special damages," such as "lost business or employment." *Ledbetter v. United Ins. Co. of Am.*, 845 F. Supp. 844, 847 (M.D. Ala. 1994); *see also Collins v. BSI Financial Services*, No. 2:16-cv-262-WHA, 2016 WL 6776284, at *14 (M.D. Ala. Nov. 15, 2016) ("[I]n the absence of language imputing a person with the commission of a crime—that is, in the absence of slander *per se*—both libel and slander require Plaintiffs to plead special damages."); Fed. R. Civ. P. 9(g) ("If an item of special damage is claimed, it must be specifically stated.").

Nowhere in Plaintiffs' Amended Complaint do they specifically plead special damages, which alone is fatal to their defamation claim. *See Collins v. BSI Fin. Serv's*, No. 2:16-cv-262-WHA, 2017 WL 1045062, at *3 (M.D. Ala. Mar. 17, 2017) (dismissing nearly identical defamation claim for failure to allege special damages). Moreover, Plaintiffs have provided absolutely no evidence that they suffered any "material loss capable of being measured in money" or any "lost business or employment." Indeed, it would be impossible for Mr. Harris to lose business or employment given that he is not employed, and Mrs. Harris's part-time employment has not changed in any way based on the publication of foreclosure notice. (D.E. 52-2, pp. 22:10-24:9; D.E. 52-3, pp. 10:3-15). Consequently, Chase is entitled to judgment in its favor on Plaintiffs' claim for defamation.

### E.     Plaintiffs' RESPA Claim Fails As A Matter Of Law.

While Plaintiffs do not cite to a single provision of RESPA, they vaguely allege that Chase "violated the Real Estate Settlement Procedures Act (REPA) [*sic*] by failing to acknowledge or respond to Harrises' [*sic*] Qualified Written Request (QWR) within the time provided by federal law." (D.E. 20, at ¶ 92). Plaintiffs assert that QWRs were sent to Chase by first class mail on June 3, 2015, February 28, 2016, June 13, 2016, and July 18, 2016, and "Defendants [*sic*] never acknowledged receipt of the QWR request and never responded to it." (*Id*. at ¶ 93) (emphasis added). As discussed below, Plaintiffs' factually inaccurate allegations fail to state a claim under RESPA, much less establish a REPSA violation.

### 1.     Chase Timely Responded To The QWRs It Received.

RESPA requires the servicer of a federally regulated mortgage loan to provide a written response to a borrower's QWR, acknowledging receipt of the request, within five (5) business days of receipt, and to correct or otherwise respond to the QWR within thirty (30) business days. *See* 12 U.S.C. § 2605(e)(1)(A); 2605(e)(2). Plaintiffs' contention that Chase did not acknowledge or respond to their QWRs within the time-frame dictated by REPSA is, like their other contentions, utterly false.

For starters, Attorney Lay's June 8, 2015 "QWR" was not a QWR at all because he did not have authorization to seek or obtain Plaintiffs' confidential

27

account information. (D.E. 52-1, ¶¶ 19-20 and Ex. 18-20 thereto). On or about June 15, 2015, Chase wrote to Plaintiffs to acknowledge receipt of Attorney Lay's June 8, 2015 letter and to advise that it required Plaintiffs' written authorization in order to provide confidential account information to anyone purporting to represent Plaintiffs' interests. (D.E. 52-1, ¶ 20 and Ex. 19 thereto; D.E. 52-2, pp. 130:12-131:12 and Ex. 26 thereto). Chase followed up by letter dated June 17, 2015 with an Authorization to Furnish and Release Information ("Authorization") and advised Mr. Harris to "resubmit [his] request for information about this account" after the Authorization was signed, returned and processed. (D.E. 52-1, ¶ 20 and Ex. 20 thereto; D.E. 52-2, pp. 130:12-131:12 and Ex. 26 thereto). Chase (through its foreclosure counsel) followed up with Attorney Lay on November 16, 2015, November 30, 2015, December 22, 2015, January 5, 2016, and January 20, 2016, requesting a signed authorization. (Harris 88, 90-93). As such, it is clear that Chase had not received the authorization as late as January 20, 2016 (*see id.*), and tellingly, Plaintiffs never resubmitted their request for information as previously instructed. Nevertheless, on February 8, 2016, after Chase's repeated requests for authorization went unacknowledged, Chase sent a response to Plaintiffs' "QWR" notifying Plaintiffs that the Loan was valid and legally enforceable, identified Chase as the loan servicer, and provided a breakdown of all amounts due and owing on the Loan. (Ex. 21 to D.E. 52-1; Exs. 27 and 33 to D.E. 52-2). Chase also

28

enclosed copies of the Loan Transaction History (from the inception of the loan to the present), the Note, the Mortgage, and a Payoff Quote. (*Id.*).

Chase did not receive another letter from Plaintiffs or Attorney Lay until October 24, 2016, when by letter dated October 21, 2016, Attorney Lay sent an identical QWR to Chase. (D.E. 52-1, ¶ 22 and Ex. 22 thereto). On or about October 31, 2016, Chase acknowledged receipt of the October 24, 2016 QWR—within the five day statutory timeline. *See* 12 U.S.C. § 2605(e)(1)(A); (D.E. 52-1, ¶ 23 and Ex. 23 thereto). Chase responded to the October 21, 2016 QWR by letter dated November 2, 2016—within the thirty day statutory deadline—notifying Plaintiffs that the Loan was valid and legally enforceable, identified Chase as the loan servicer, and provided a breakdown of all amounts due and owing on the Loan. (D.E. 52-1, ¶ 24 and Ex. 24 thereto). Chase also enclosed copies of the Loan Transaction History (from the inception of the loan to the present), the Note, the Mortgage, and a Payoff Quote. (*Id.*).

Accordingly, any contention that Chase failed to timely acknowledge or respond to the only two "QWRs" it received is completely baseless.[10]

---

[10] Plaintiffs have never challenged the substance of Chase's QWR responses. But, even if they had, Chase's February 8, 2016 and November 2, 2016 responses fully complied with the requirements set forth in Section 2605(e) and Section 1024.36(d)(1) of Regulation X. The responses notified Plaintiffs that the Loan was valid and legally enforceable, identified Chase as the loan servicer, and provided a breakdown of all amounts due and owing on the Loan. (Exs. 21 and 24 to Hernandez Aff.; Exs. 27 and 33 to D.E. 52-2). Chase also enclosed copies of the Loan Transaction History (from the inception of the loan to the present), the Note, the Mortgage, and a

2.      Chase Did Not Receive Certain QWRs From Plaintiffs.

As noted above, Plaintiffs allege that they sent certain "QWRs" to Chase on February 28, 2016, June 13, 2016, and July 18, 2016. However, Chase has no record of any QWRs bearing those dates. (D.E. 52-1, ¶ 22). Although Plaintiffs produced QWRs which were dated February 28, 2016, June 13, 2016, and July 18, 2016, they have presented no evidence that any of those letters were either sent or received. And, importantly, the QWRs are **identical** to the June 8, 2015 and October 21, 2016 QWRs, both of which Chase timely and properly responded to. As such, Plaintiffs received all of the information they sought in both QWRs, which bookended the February 28, June 13, and July 18 QWRs they purportedly sent in. For this reason alone, they clearly have not sustained any damages as a result of lacking such information.

In this regard, Mr. Harris testified that he had not even seen the June 13 and July 18 QWRs, had no knowledge whether any of the QWRs were ever sent to Chase, and was not aware whether Chase ever responded to any of the QWRs. (D.E. 52-2, 132:23-137:3). Put simply, Chase's records only reflect receipt of two

Payoff Quote. (*Id.*). The information provided was fully responsive to the requests and Plaintiffs have not alleged otherwise.

QWRs, both of which were timely acknowledged and responded to.[11] Because Chase did not receive the February 28, 2016, June 13, 2016, and July 18, 2016 "QWRs," it was under no obligation to respond (and could not have responded). As such, any RESPA claim based on these QWRs fails and Chase is entitled to judgment in its favor.

### 3. Plaintiffs Suffered No Damages Related To Any Purported RESPA Violations.

As discussed above, it is undisputed that Chase timely and fully responded to the QWRs which were actually received by Chase. However, even if Plaintiffs could show otherwise despite their own admissions and the uncontroverted evidence of record, Plaintiffs' RESPA claim still fails because they have suffered no damages.

In order to state a claim under RESPA, a plaintiff must allege facts showing that he suffered <u>actual damages</u> which are <u>causally linked</u> to the REPSA violation.[12] 12 U.S.C. § 2605(f); *Renfroe v. Nationstar Mortg.,* LLC, 822 F.3d

---

[11] Even if Chase received these QWRs (which there is no evidence of), Plaintiffs suffered no damages as a result of Chase's failure to respond. As such, Plaintiffs' RESPA claim fails for this additional reason. *See* Section (IV)(E)(3), *infra*.

[12] REPSA also allows recovery of statutory damages for "any <u>additional</u> damages, as the court may allow, in the case of a pattern or practice of noncompliance with the requirements of this section, in an amount not to exceed $2,000." 12 U.S.C. § 2605(f)(1)(B) (emphasis added). Plaintiffs cannot recover statutory damages because (1) they are not entitled to actual damages, (2) do not request statutory damages, (3) do not plead a "pattern or practice of noncompliance," and (4) have no evidence of a "pattern or practice" of noncompliance. *See Selman*, 2013 WL 838193, at *9 n. 10 ("The Court recognizes the existence of authority bolstering [the] contention

1241, 1246 (11th Cir. 2016) ("[D]amages are an essential element in pleading a RESPA claim"); *Selman v. CitiMortgage, Inc.*, No. 12-0441-WS-B, 2013 WL 838193, *9 (S.D. Ala. Mar. 5, 2013) (noting that the "borrower's actual damages must flow directly from the servicer's lack of a timely response in order to be cognizable.").

First of all, a cursory review of the (duplicative) QWRs demonstrates that they are simply "form" or "canned" request that have absolutely no relevance or bearing on the facts and issues presented in <u>this case</u>. Specifically, the stated purpose of Plaintiffs' QWR is to seek information regarding the "proper application of payments," the use of "suspense accounts," the assessment of "late charges," automatically "triggered property inspections and broker price opinions," and corporate advances for "legal fees." (*See e.g.,* Ex. 24 to D.E. 52-2). Plaintiffs, however, do not (and cannot) make the required connection between the damages they supposedly suffered and any alleged RESPA violation by Chase. Plaintiffs cannot make this connection because their counsel's first RESPA letter was issued <u>more than five years</u> after Plaintiffs' last payment on the Loan. As such, Chase's response (or lack thereof) regarding post-default "charges" or "fees" that have

---

that proof of actual damages is mandatory to recovery on a § 2605(e) violation, and that a 2605(e) claim cannot stand on statutory damages alone …. This issue need not be decided here, however, because the Second Amended Complaint does not state an adequate factual predicate to support even a claim for statutory damages.").

never been paid could not have conceivably resulted in damages.[13]

The allegations of the Amended Complaint regarding such "damages" are equally implausible. Plaintiffs vaguely allege that they suffered damages because they "had to hire an attorney" related to Chase's purported failure to respond to their QWRs. (D.E. 20, at ¶ 93). This, of course, is impossible because Plaintiffs' attorney wrote the QWRs at issue. (D.E. 52-1, ¶¶ 19, 22 and Exs. 19 and 22 thereto). Along these same lines, Plaintiffs allege that they were "not able to stop the foreclosure proceedings" because of Chase's purported RESPA violation, but they have not alleged that any foreclosure sale was conducted, they admit that they are still living in the house to date (despite not making payments for almost eight years), and Chase has currently suspended foreclosure proceedings. (D.E. 52-2, at 180:4-180:13; D.E. 52-1, ¶ 26). Plaintiffs also make a slew of other vague allegations concerning their loss of "business clients," loss of income, and damage to their "standing and reputation" in the community. (D.E. 20, at ¶ 93). These allegations, of course, are directly contradicted by Mr. Harris's admission that he does not work and therefore he could not have "lost business clients "or suffered a

---

[13] Plaintiffs vaguely allege that "fees" and "charges" were needed in order to obtain a "proper accounting" to cure. (D.E. 20, at ¶ 93). Aside from the fact that a "proper accounting" was provided, including a Payoff Quote and Payment History Report, Plaintiffs cannot seriously contend that they would have reinstated had they known the "fees" or "charges" assessed post-default. Mr. Harris testified that they had minimal monthly income, he did not work, and Plaintiffs clearly were not in a financial position to reinstate in June 2015 (hence why they requested multiple RMAs), much less by the time the last QWR was sent in October 2016. (*See* D.E. 52-2, pp. 22:10-24:9).

loss of income. (*See* D.E. 52-2, pp. 22:10-24:9). And tellingly, Plaintiffs have wholly failed to provide any evidence supporting any of these conclusory allegations, much less provide evidence linking such damages to the alleged (yet inaccurate) failure to receive information about the alleged <u>post-default</u> charges or fees assessed to the Loan. Because Plaintiffs have failed to plead any facts or present any evidence demonstrating the causally-connected actual damages necessary for a RESPA claim, summary judgment should be entered in favor of Chase.

### F.   Plaintiffs' FCRA Claim Fails Because They Never Submitted A Dispute To Any Credit Reporting Agency Or Chase.

Under FCRA, a plaintiff has a private right of action only for violations of section 1681s-2(b), and only if "the furnisher received notice of the consumer's dispute from a consumer reporting agency." *Jackson v. Bank of New York Mellon*, No. 16-062-CG, 2016 WL 4942085, at *14 (S.D. Ala. July 19, 2016) (dismissing FCRA claim where plaintiffs failed to plead facts supporting that furnisher was notified of a dispute from credit reporting agency); *Gregory*, 2016 WL 4540891, at *18 ("An essential element of an FCRA investigation claim against a furnisher of information to credit reporting agencies is that the furnisher was notified of the dispute by the credit reporting agency").

Plaintiffs' FCRA claim is based on their allegation that they "repeatedly contacted . . . the credit bureaus in November 2014, June 2015, and January 2016"

34

and in turn, that the "credit bureaus" sent notice to Chase. Despite these allegations, Plaintiffs have failed to provide any evidence of their supposed dispute, their contact with any credit reporting agency, their contact with Chase, or Chase's contact with any credit reporting agency. Plaintiffs' failure to provide any specifics/evidence is hardly surprising, as Mr. Harris testified that Plaintiffs <u>never contacted any credit reporting agency or informed them of any dispute</u>. (D.E. 52-2, 159:1-4 Q. "I'm just asking if you've talked to [the credit reporting agencies]. I'm just trying to get to the bottom of the information." A. "No, I ain't talked to them."). Mr. Harris also admitted that he never raised any dispute with Chase regarding its credit reporting. (D.E. 52-2, p. 161:10-15). Because Chase was never informed of (the non-existent) dispute by any credit reporting agency, which is an essential element of any FCRA claim under section 1681s-2(b), Chase is entitled to summary judgment on Plaintiffs' FCRA claim in Count Eleven.

### G.     Plaintiffs' FCDPA Claim (Count Twelve) Fails Because Chase Is Not A "Debt Collector" Under The FDCPA.

Plaintiffs' claim against Chase for violations of the FDCPA fails because Chase is not a "debt collector" under the FDCPA. The FDCPA distinguishes between "creditors," which are not subject to the FDCPA, and "debt collectors," which are subject to the FDCPA. To qualify as a "debt collector," an entity must satisfy one of two requirements: either it (1) "[U]ses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is

the collection of any debts"; or (2) "[R]egularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another." *See* 15 U.S.C. § 1692a(6). Even if one of these requirements is satisfied, the definition excludes several categories of entities, including "any person collecting or attempting to collect any debt . . . to the extent such activity . . . concerns a debt which was not in default at the time it was obtained by such person." *See* 15 U.S.C. § 1692a(6)(F)(iii).

Here, Chase is not a debt collector because Plaintiffs' mortgage loan was not in default at the time Chase acquired it, and in addition, Chase does not satisfy either of the prongs of the definition of "debt collector."

      1.     <u>Plaintiffs Were Not In Default When Chase Acquired Their Mortgage Loan.</u>

Plaintiffs' mortgage loan was executed in favor of Long Beach, which was a predecessor by merger of WaMu, and Chase acquired Plaintiffs' mortgage loan from WaMu through the P&A Agreement on September 25, 2008. (*See* D.E. 52-1, ¶¶ 3-5). Importantly, as of September 25, 2008, Plaintiffs were current on their payments and their mortgage loan was not in default. (*Id.* at ¶ 6; Ex. 4 thereto). Thus, Plaintiffs' debt "was not in default at the time it was obtained by" Chase and Chase is excluded from the definition of a "debt collector" under the FDCPA. Accordingly, because the FDCPA only applies to and provides for claims against "debt collectors," and Chase is not a "debt collector" under the FDCPA, Plaintiffs'

claim in Count Thirteen fails.

### 2. Chase Is Not A Debt Collector Because It Owns The Debt At Issue.

As noted above, to qualify as a "debt collector," an entity must use "any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the collection of any debts" or collect debts "owed or due or asserted to be owed or due another." *See* 15 U.S.C. § 1692a(6). Here, Chase does not satisfy either requirement.

As an initial matter, it goes without saying that the principal purpose of Chase—the largest bank in the United States—is not collection of debts. Instead, Chase is a diversified bank which engages in retail banking, mortgage loans, and issuing credit cards. "Debt collection" is a minor fraction of Chase's business, and Plaintiffs have tellingly provided no evidence demonstrating that Chase's principal purpose is the collection of debts. As such, Chase does not satisfy the first requirement.

With respect to the second requirement, it is now well-settled that an entity which purchases a debt and collects the debt on its own behalf is not "collecting a debt owed or due another" under the FDCPA. *See Henson v. Santander Consumer USA Inc.*, 137 S. Ct. 1718, 1719 (2017) (stating that FDCPA's "plain language seems to focus on third party collection agents regularly collecting for a debt owner—not on a debt owner seeking to collect debts for itself"); *Davidson v.*

*Capital One Bank (USA)*, 797 F.3d 1309, 1318 (11th Cir. 2015) (dismissing FDCPA claim and stating "[b]ecause Capital One acquired Davidson's credit card account . . . Capital One's collection efforts in this case relate only to debts owed to it—and not to 'another'"); *Kurtzman v. Nationstar Mortgage, LLC*, No. 16-17236, --- F. App'x ----, 2017 WL 4511361, at *3 (11th Cir. Oct. 10, 2017). Here, Chase acquired Plaintiffs' mortgage loan from WaMu through the P&A Agreement in September 2008. (D.E. 52-1, ¶ 5). Accordingly, just as Capital One in *Davidson*, Chase is collecting Plaintiffs' debt on its own behalf, not on behalf of another. As such, Chase is not a "debt collector" under the FDCPA, and therefore Chase is entitled to judgment as a matter of law in its favor on Plaintiffs' FDCPA claim.

## V.   **CONCLUSION**[14]

For the reasons set forth herein, summary judgment should be granted in favor of Chase and against Plaintiffs on their remaining claims for breach of contract (Count Six), false light (Count Eight), defamation (Count Nine), violations

---

[14] For all the reasons set forth herein, Chase should also be granted judgment in its favor on Plaintiffs' request for a declaratory judgment prohibiting Chase from exercising the power of sale and/or quieting title to the property. Plaintiffs' request for a temporary injunction is moot as Chase has voluntarily suspended foreclosure proceedings pending the outcome of this litigation. With respect to Plaintiffs' claim for a permanent injunction, the "standard for a permanent injunction is essentially the same as for a preliminary injunction *except that the plaintiff must show actual success on the merits* instead of a likelihood of success." *Siegel v. LePore*, 234 F.3d 1163, 1213 (11th Cir. 2000) (citation omitted) (emphasis added). Because Plaintiffs cannot "show actual success on the merits," given that their claims all fail, their claim for permanent injunctive and/or declaratory relief must likewise fail.

of RESPA (Count Eleven), violations of FCRA (Count Twelve), violations of
FDCPA (Count Thirteen), and declaratory relief (Count Sixteen).

Respectfully submitted,

*/s/ Joshua R. Hess*
John David Collins
Joshua R. Hess

*Attorneys for Defendant JPMorgan
Chase Bank, N.A.*

**OF COUNSEL:**
MAYNARD, COOPER & GALE, P.C.
1901 Sixth Avenue North, Suite 2400
Birmingham, Alabama 35203
Phone: (205) 254-1000
Fax:   (205) 254-1999
jcollins@maynardcooper.com
jhess@maynardcooper.com

39

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 18, 2017, a copy of the foregoing has been served on the following counsel for by using the CM/ECF system and/or U.S. Mail, postage prepaid and properly addressed:

Kenneth James Lay
HOOD & LAY, LLC
1117 22nd Street South
Birmingham, Alabama 35205

*/s/ Joshua R. Hess*
**OF COUNSEL**